TRAMMELL *v.* STATE.

Crim. 3998

Opinion delivered October 19, 1936.

22

*Partain & Agee, Roy Gean* and *Hardin & Barton,* for appellant.

*Carl E. Bailey,* Attorney General, and *J. F. Koone,* Assistant, for appellee.

SMITH, J. Appellant was indicted for murder in the first degree, alleged to have been committed by killing one Mary Mahar. Upon his trial he was found guilty of voluntary manslaughter and given a sentence of seven years in the penitentiary, from which is this appeal.

It is first very earnestly insisted that the testimony is not legally sufficient to sustain the verdict and judgment, and this appears to be the assignment of error chiefly relied upon for the reversal of the judgment.

The case grows out of a tragedy which happened at the Grotto Club swimming pool about thirty miles from Fort Smith. A party of fifteen young people, residents of that city, consisting of seven couples, some of whom were married, and one extra young man, went to the pool on July 4, 1935, to swim. Appellant went on his

motorcycle, and was the escort of a young woman named Dorothy Karps, who became and was the most important witness against him at the trial from which this appeal comes. Miss Karps testified that on the way to the clubhouse appellant stopped and bought a bottle of whisky, and they had several drinks. Other members of the party also had whisky. Appellant's brother, Mont Trammell, escorted the deceased, Mary Mahar, who was a young woman less than fifteen years old according to the testimony of her mother.

All the members of the party except the two young women just named had bathing suits. Having no suits, they did not undress at the clubhouse, as other members of the party did except appellant, who did not go in bathing until later. The young women went a few hundred yards up the creek, and removed all their clothing except their step-ins and brassieres, after which they went bathing in the creek. To reach the place where they undressed they had to walk about two miles to cross the creek on a bridge. Witnesses described the part of the creek where the bathers were as being like a lake about a half-mile long and from seventy-five to one hundred twenty-five feet wide. Dorothy Karps testified that appellant came to the place where she and Mary Mahar were in the water. They asked appellant for a match to light cigarettes. Appellant told Mary to come get one. When she came out of the water to get the match appellant took hold of her arm and then asked her to have sexual intercourse with him. Mary said, "I am sorry I came," and ran into the woods. Appellant pursued her. Dorothy further testified that she heard some one scream in the woods, and that appellant returned alone after an absence of thirty or forty minutes, and she never saw Mary again alive. Dorothy also testified that appellant presented a disheveled appearance, his shirt was torn, "his pants messed up," and there was grass in his hair. Dorothy dried her clothes and dressed. When she saw appellant at the clubhouse he inquired where Mary was. Appellant said to her that if she told anything about what she had seen and heard he would kill her. Appellant

told her he went into the woods with Mary to fill a date with her, and told her not to tell his brother Mont, who was Mary's escort and who had been going with her for some months.

Search for Mary began when her absence was discovered. It was continued until dark without finding her. Dorothy asked appellant to take her home. He declined to do so, saying that he would continue to search until he found Mary, and he remained there all night.

Mary was last seen alive some time Thursday afternoon. Her body was not found until the following Saturday morning. It was discovered about a quarter of a mile from the place where she was last seen in the water. Her head was down in the water hanging against a large rock, with her back and hips projecting upwards out of the water. The body was recovered and an inquest held by the coroner and an autopsy performed by two physicians, who testified at the trial. The doctors testified that they found no water in Mary's lungs, but they also testified that the absence of water in the lungs was not uncommon in cases of death by drowning, being true, according to the medical authorities, in about forty-eight per cent. of such cases. They found a fracture of the third vertebra, which might have caused death, but would not necessarily have done so, unless the spinal cord had been injured. They could not tell whether the fracture occurred before or after death. They did not testify whether the spinal cord had been injured or not, but the injury to the vertebra could have occurred as well after death as before.

Appellant did not testify at the trial from which this appeal comes, but he did testify at length at the inquest and his testimony at that trial, which had been stenographically reported, was read at his trial in the circuit court. He admitted in his testimony before the coroner's jury that he had sexual intercourse with Mary in the woods, but said he had done so with her consent, and they had made an appointment for another meeting later in the week. His testimony at the inquest was to the effect that when he and Mary returned from the woods she

re-entered the water, and he saw her body bobbing up and down in the water. That she must have gone under the water some six or seven times, but he thought nothing of it, as he supposed she was playing. Two other members of the swimming party saw Mary in the water and reached the same conclusion.

Many witnesses testified, and the record is voluminous, and there are many conflicts and contradictions which presented questions of fact for the jury's review and decision.

It was the theory of the defense that Mary had drowned, and that her body had floated for a quarter of a mile and had lodged against the rocks, where her neck was broken by the pressure of the water, and that appellant's good faith and innocence was shown by the persistence with which he continued his search for the body during the night following Mary's disappearance.

It is the theory of the state that appellant had sexual intercourse with Mary forceably and against her will, and later murdered her to conceal his crime and remained near the creek to throw the body in the water when he might do so unobserved.

The testimony of Dorothy Karps, if credited, as the jury had the right to do, in conjunction with other facts and circumstances detailed in evidence, is sufficient to sustain the State's theory, in which event appellant would, of course, have been guilty of murder in the first degree. On the other hand, the testimony as to her being in the water after the meeting in the woods, if credited by the jury, would have required his acquittal. The verdict returned does not comport with either theory, as is frequently the case in jury trials. In such cases we may only determine, on the appeal to this court, whether the testimony is legally sufficient to support the verdict which was returned, and as we think it was the judgment must be affirmed so far as the sufficiency of the testimony is concerned. *Fulbright* v. *Phipps,* 176 Ark. 356, 3 S. W. (2d) 49; *Griffin Grocery Co.* v. *Thaxton,* 178 Ark. 736, 11 S. W. (2d) 473; *Elm Springs State Bank* v. *Bradley,* 179 Ark. 437, 16 S. W. (2d) 585; *McGuire* v. *Robertson,* 182

Ark. 759, 32 S. W. (2d) 624; *Powers v. Wood Parts Corporation,* 184 Ark. 1032, 44 S. W. (2d) 324; *Hanson v. Louisiana Oil Refining Corporation,* 186 Ark. 331, 53 S. W. (2d) 430; *Dixon v. State,* 191 Ark. 526, 87 S. W. (2d) 17.

The mother of the deceased was the first witness called for the state. She was permitted to introduce, identify and offer in evidence a photograph of her daughter, and that action is assigned as error. The only useful purpose the picture could have served would have been to identify the deceased, and that question was not in issue, and the picture was, therefore, without probative value. It is inconceivable, however, that this unnecessary evidence could have been prejudicial.

After deceased's mother had testified she was permitted, over appellant's objection, to remain in the courtroom, although the rule had been ordered as to all other witnesses. She was not again called as a witness. The statute provides that ''If either party require it, the judge may exclude from the courtroom any witness of the adverse party not at the time under examination so that he may not hear the testimony of the other witness.'' Section 4191, Crawford & Moses' Digest. But it has often been held that the enforcement of this rule is a matter within the sound discretion of the court, and there appears to have been no abuse of this discretion. *Mikel v. State,* 182 Ark. 924, 33 S. W. (2d) 397.

Some months after the tragedy and a few days before the trial in the circuit court two witnesses, at the instance of the prosecuting attorney, made tests to determine the velocity of the water in the lake, or that portion of the creek where Mary had been bathing, and where her body was found. This test was made by throwing three small logs weighing 60 to 65 pounds in the water at different places and measuring eleven hours later the distance they had floated. The witnesses who made the tests stated that one log or chunk, as it was also called, was 150 feet towards the north bank down stream from where it was thrown into the water, the second one about 190 to 200 feet across from the south bank. The

other was about 25 feet below that one. This was 235 feet down stream and some distance from the bank.

This testimony was objected to upon the ground that the conditions of the test were not shown to have been identical with those under which the corpse floated down the lake or creek, and that it was irrelevant and immaterial. The test may not have had high probative value, but we cannot say that it was without value. It was a very simple test to establish the velocity of the water, which did not require an expert to make. Nor can we say there was such lack of similarity of conditions as to render it inadmissible on that account. The test was made in the same body of water. It was not made until some months after the death of Miss Mahar, but there was a difference only of from four to six inches in the flood level of the water. A human body was not used in the test, but that could not be expected.

We conclude, therefore, there was no such dissimilarity of conditions attending the test with those incident to the tragedy as to render the testimony relating to the experiment incompetent and prejudicial. *St. Louis, I. M. & So. Ry. Co.* v. *McMichael,* 115 Ark. 101, 171 S. W. 115; *St. Louis, I. M. & So. Ry. Co.* v. *Kimbrell,* 117 Ark. 457, 174 S. W. 1183; *Bona* v. *S. R. Thomas Auto Co.,* 137 Ark. 217, 208 S. W. 306; *Houston* v. *State,* 165 Ark. 294, 264 S. W. 869.

It is argued that the court refused to permit full cross-examination of the State's witnesses, and especially Miss Karps, in regard to the length of time she had spent in jail. It does appear that the court was somewhat impatient, if not petulant, with counsel for appellant, but this may have so appeared as the result of the efforts of court to expedite the trial. In this connection it may be said that the efforts of trial courts to dispatch the business before them is commendable, but the rights of an accused person, or a litigant before the court, to fully and properly present testimony in his own behalf and to cross-examine witnesses testifying adversely is of more importance, and should not be abridged, even for the sake of expedition. While the court did interfere more

than once with the cross-examination of Miss Karps, it does not appear that appellant's counsel was denied the right to ask any relevant question. Miss Karps admitted having been confined in jail on four separate occasions, and for several days at a time, but these incarcerations appear to have occurred subsequent to the tragedy and to have been related to it. Indeed, the coroner ordered her held to await the action of the grand jury after the inquest, and she was brought to Little Rock and confined in jail in that connection. She admitted that she had been brought into court from the local jail, where she was being held as a witness. These were all circumstances, brought out by counsel for appellant, going to the credibility of the witness, as the court stated to the jury. We are unable to say that the court abused its discretion by unduly limiting the right of cross-examination.

The court gave § 2342, Crawford & Moses' Digest, as an instruction: "The killing being proved, the burden of proving circumstances of mitigation that justify or excuse the homicide shall devolve on the accused, unless by the proof on the part of the prosecution it is sufficiently manifest that the offense committed only amounted to manslaughter, or that the accused was justified or excused in committing the homicide."

Two objections were made to this instruction. The first was that the killing had not been proved, as the instruction apparently assumed. The second objection was that there was no issue of justifiable or excusable homicide in the case. Answering these objections, it may first be said that the instruction does not assume that the killing was proved. It does not say that if death were proved, but that if the killing were proved. That remained a fact to be found by the jury, but, if found to be true, then the law imposes upon the killer the burden of proving circumstances of mitigation that justify or excuse the homicide. And the second objection is answered by saying that if the killing were proved, then the burden stated is cast upon the accused. The law so provides.

It is argued, in this connection, that the giving of this and other instructions on the lesser degrees of homicide resulted in the jury finding appellant guilty of voluntary manslaughter, whereas he was either guilty of murder in the first degree or of no crime at all. It has been frequently held, however, that this is an error of which the accused may not complain where the testimony supports the finding that he was guilty of a higher degree of homicide than that for which he was convicted, as is the case here. *Roberts* v. *State*, 96 Ark. 58, 131 S. W. 60; *McGough* v. *State*, 113 Ark. 301, 167 S. W. 857; *Arnold* v. *State*, 179 Ark. 1066, 20 S. W. (2d) 189; *Spear* v. *State*, 184 Ark. 1047, 44 S. W. (2d) 663.

The court gave an instruction numbered 18 reading as follows: "It is as competent to convict upon circumstantial evidence as upon positive evidence. Positive evidence is said to be that of eye-witnesses, people who testify as to the transaction that shows the guilt or innocence of the defendant. Circumstantial evidence is testimony as to circumstances from which guilt or innocence is proved or disproved. In cases of circumstantial evidence it is necessary, in order to convict, not only that the circumstances should point to and be consistent with the defendant's guilt, but they should be inconsistent with any other reasonable hypothesis. This does not mean any more than this, that the facts and circumstances in the whole case taken together, if they should convince you of his guilt beyond a reasonable doubt, it is sufficient to convict. If they do not, it is not sufficient."

It is insisted that the last sentence of this instruction is in conflict with the remainder thereof, and operates to nullify the preceding portion.

It is the usual, and probably the better, practice, in cases where circumstantial evidence is solely relied upon, to give an instruction to the effect that, in order to convict upon such evidence alone, the circumstances should point to and be consistent with the defendant's guilt, and should be inconsistent with any other reasonable hypothesis. But we have held that it was not error to

refuse to do so where the jury was otherwise properly instructed on the questions of the presumption of innocence and the law as to a reasonable doubt. A number of cases to this effect are cited in the case of *Osburne* v. *State,* 181 Ark. 661, 27 S. W. (2d) 783. In one of these, that of *Jones* v. *State,* 61 Ark. 88, 32 S. W. 81, a headnote reads as follows: ''It is not error to refuse an instruction that, before defendant can be convicted of murder upon circumstantial testimony, the jury must find that the circumstances proved establish the guilt of defendant to the exclusion of every other reasonable hypothesis, if the jury were properly instructed as to the burden of proof resting upon the State and as to reasonable doubt.'' Justice HUGHES there quoted from the case of *Green* v. *State,* 38 Ark. 304, in which a similar instruction had been refused, the following statement by Chief Justice ENGLISH: ''In the case of *Green* v. *State,* 38 Ark. (304) 316, the appellant asked the following instruction, which was refused, to-wit: 'That in cases of circumstantial evidence, before the jury can convict, the guilt of the defendant should be made out, not only beyond a reasonable doubt, but to the exclusion of every other reasonable hypothesis.' In delivering the opinion of the court, Chief Justice ENGLISH said: 'It was putting it very strong to require the State not only to prove the guilt of the accused beyond a reasonable doubt, but to go further and prove it to the exclusion of every other reasonable hypothesis. Either would be sufficient.' There was no error in refusing the instruction asked by the appellant.'' See also *Scott* v. *State,* 180 Ark. 408, 21 S. W. (2d) 186.

The last sentence in instruction numbered 18, set out above, does not negative the preceding portion. It merely explains it. The evidence in such cases must exclude every reasonable hypothesis of innocence, but this is done when the evidence convinces the jury beyond a reasonable doubt of the accused's guilt. There could be no finding that the accused was guilty beyond a reasonable doubt, if it were also found that the testimony had established a reasonable explanation of the crime which was

inconsistent with the finding that there was no reasonable doubt of the guilt of the accused.

In the chapter on circumstantial evidence appearing in the 4th Edition of Underhill's Criminal Evidence, it is said that circumstantial evidence alone is sufficient to support a verdict of guilty of the most heinous crimes, provided the jury believes beyond a reasonable doubt that the accused is guilty upon the evidence, and this can never be where the evidence is entirely consistent with innocence, but that no greater degree of certainty in proof is required when the evidence is all circumstantial than where it is direct, as in either case the jury must be convinced of the prisoner's guilt beyond a reasonable doubt. It was there also said: ''The first duty of the jury is to determine carefully upon all the testimony as stated by the witnesses whether the incriminating circumstances, from which they may infer guilt, are proved beyond a reasonable doubt. A conviction is not warranted where the evidence is as consistent with innocence as it is with the hypothesis of guilt. A verdict of guilty cannot be sustained which does not exclude every reasonable hypothesis but that of guilt. However, circumstantial evidence is not required to preclude all hypothesis except guilt, but it must exclude the possibility of innocence beyond a reasonable doubt.'' Section 17, pp. 19, 20, 21. Our own case of *Withem* v. *State,* 175 Ark. 453, 299 S. W. 739, is cited, among others, in support of the text quoted.

We think the instruction, read in its entirety, conforms to this statement of the law. The evidence must exclude every reasonable hypothesis of innocence; but this is done when the evidence convinces the jury of the prisoner's guilt beyond a reasonable doubt.

Certain other exceptions saved at the trial are argued in the briefs, and have been duly considered, but we find it unnecessary to discuss them.

Upon a consideration of the whole case, we find the testimony legally sufficient to support the verdict, and that the trial was free from prejudicial error. The judgment must therefore be affirmed, and it is so ordered.